IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 25, 2020

## SHASTA JACKSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County
No. 109248      G. Scott Green, Judge**

### No. E2019-01148-CCA-R3-PC

The Petitioner, Shasta Jackson, appeals as of right from the Knox County Criminal Court's denial of her petition for post-conviction relief. The Petitioner contends that she received ineffective assistance of trial counsel when counsel advised her to testify at trial. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Shasta Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

#### I.  Trial

The Petitioner's convictions arose from a September 1, 2012 shooting at The Grand, a crowded Knoxville nightclub, which resulted in the death of innocent bystander Esley Clemmons. State v. Shasta Jackson, No. E2014-01387-CCA-R3-CD, 2015 WL 6756318, at *1 (Tenn. Crim. App. Nov. 5, 2015). The Petitioner and her co-defendant, Princestenia

Robinson,[1] were charged with the felony murder of Mr. Clemmons, the attempted murder of Shondia Williams and Britnie Davis, and multiple counts of employing a firearm during the commission of a dangerous felony. Id.

The shooting arose from a disagreement between two groups of women. Jackson, 2015 WL 6756318, at *1. The Petitioner, Ms. Robinson, and LeeKirdrah Haynes were friends, and all of them were affiliated with the Westside 111 Neighborhood Crips group.[2] Ms. Haynes testified at trial that the Petitioner and Ms. Robinson carried .380 semi-automatic handguns and that the two women shared bullets. Id. at *2. Around 3:00 a.m. on September 1, 2012, the Petitioner, Ms. Robinson, and Ms. Haynes drove past The Grand; Ms. Davis, Ms. Williams, and other people were standing outside the nightclub talking. Id. Ms. Davis testified that one of the women in the car called her a "b--ch"; the witnesses differed on whether Ms. Davis or Ms. Williams then spat on the car. Id. In any event, the Petitioner drove past the nightclub a second time, during which Ms. Robinson held a gun outside the car's window. Id. Ms. Davis and Ms. Williams did not feel threatened by this act, and Ms. Davis walked back to her car before deciding to go back to the nightclub and fight the Petitioner. Id.

Ms. Davis testified that the Petitioner, Ms. Robinson, and Ms. Haynes walked up to the nightclub wearing sneakers, which indicated that they were prepared for a fight. Jackson, 2015 WL 6756318, at *2. According to Ms. Davis, both Ms. Robinson and the Petitioner pointed guns at her; after "shots just started firin'[,]" Ms. Davis ran into the woods behind the nightclub and did not return. Id. Although Ms. Davis did not see who was shooting, Ms. Haynes testified that the Petitioner shot at the ground until her gun was empty and that Ms. Robinson's gun jammed before she could open fire. Id.

After this incident, the Petitioner's group left, met a male friend, and decided to return to The Grand in the friend's car. Jackson, 2015 WL 6756318, at *2. Ms. Haynes testified that the Petitioner left her gun in her car because she had no additional bullets. Id. at *3. When they arrived at The Grand, Ms. Williams was inside talking to Mr. Clemmons and his girlfriend. Id. Ms. Williams stated that the Petitioner and Ms. Robinson entered and made gestures indicating their desire to fight, and Ms. Williams threw a bottle toward the other women. Ms. Haynes stated that after Ms. Williams threw the bottle, Ms. Haynes ran toward her, that gunshots rang out, and that Ms. Haynes ran outside. Id.

---

[1] At the time of the direct appeal, Ms. Robinson had not been located by police. At the post-conviction hearing, post-conviction counsel noted that Ms. Robinson ultimately pled guilty to "facilitation" of an unspecified offense and was sentenced to eight years in confinement.

[2] In order to mitigate any prejudicial effect of gang-related evidence, the trial court ordered that the parties refer to the gang as a "group." Jackson, 2015 WL 6756318, at *2.

Ms. Williams testified that she saw the Petitioner pull a gun out from behind her back and open fire. Jackson, 2015 WL 6756318, at *3. Mr. Clemmons was shot in the chest by a .380-caliber bullet and later died from his injuries. Id. The Petitioner's gun was tested by a firearms examiner, who concluded that the gun was used to fire bullets outside the nightclub. Id. The examiner could not conclude, however, whether the gun was used to fire the bullets or shell casings recovered inside the nightclub or from Mr. Clemmons. Id.

Ms. Haynes identified both Ms. Robinson and the Petitioner as the shooter in two conflicting police statements. Jackson, 2015 WL 6756318, at *3. At trial, Ms. Haynes claimed that she did not see which woman fired the gun, but that she had asked both of them who was responsible for the shooting and that Ms. Robinson said she "didn't mean for it to happen like that." Id. The Petitioner's police statement reflected that although she admitted to firing her gun outside the nightclub, she maintained that Ms. Robinson shot the gun inside the nightclub after concealing it in her clothing. Id.

The defense proof included testimony from Arterius North, who was also inside The Grand during the shooting and asserted that the Petitioner did not have a gun; his testimony was stricken after he refused to answer questions on cross-examination. Jackson, 2015 WL 6756318, at *4-5. The Petitioner testified that Ms. Robinson was the one who fired the gun inside The Grand. Id. at *5. The Petitioner also provided background information on her conflict with Ms. Williams, Ms. Davis, and other women; the Petitioner characterized the grudge as "girl drama" unrelated to her "group" membership. Id.

The Petitioner testified consistently with the general description given by the State's witnesses of the incident outside The Grand, except that she claimed to have pointed her gun at Ms. Williams instead of Ms. Davis. Jackson, 2015 WL 6756318, at *5. The Petitioner averred that when she returned to the nightclub in her friend's car, she left her gun behind in her car. Id. Ms. Robinson, however, brought her gun to the nightclub. Id. The Petitioner testified that inside the nightclub, she stepped between Mr. North and another man to break up an argument, that someone threw a bottle, and that someone began shooting. Id. The Petitioner stated that she left with Ms. Robinson, Ms. Haynes, and their male friend. Id. When the Petitioner asked Ms. Robinson if she was the shooter, Ms. Robinson responded that she "didn't mean to do it." Id.

The jury convicted the Petitioner on the lesser-included offenses of two counts of reckless endangerment and one count each of second-degree murder, attempted second-degree murder, and possession of a firearm during the commission of a dangerous felony. Jackson, 2015 WL 6756318, at *5. The jury acquitted the Petitioner of two counts of employing a firearm during the commission of a dangerous felony. Id. The trial court imposed an effective twenty-five-year sentence. Id.

## II. Direct Appeal

On direct appeal, the Petitioner challenged the exclusion of testimony by an expert witness, the decision to strike Mr. North's exculpatory testimony, the admission of evidence related to gangs, the sufficiency of the evidence, and her sentence. This court affirmed the convictions and sentence. Jackson, 2015 WL 6756318, at *6. Relevant to the issue in this appeal, this court concluded that the evidence was sufficient to prove that the Petitioner was criminally responsible for the shooting because the Petitioner went out with Ms. Robinson looking for a fight, gave Ms. Robinson bullets, and stood near Ms. Robinson as she shot the gun. Id. at *15-17. Although it was not articulated in the direct appeal opinion, the trial record also reflects that the Petitioner acknowledged during her testimony that she distracted a person at the nightclub door in order to facilitate Ms. Robinson's smuggling a gun into the building.

## III. Post-Conviction Proceedings

The Petitioner filed a November 3, 2016 pro se petition for post-conviction relief raising the same issues as the direct appeal and alleging that she received the ineffective assistance of trial counsel. The post-conviction court appointed counsel, who filed an amended petition on May 11, 2018, alleging that trial counsel provided ineffective assistance by advising the Petitioner to testify. The Petitioner argued that because her police statement was consistent with her trial testimony, the testimony damaged her case and "added no value to her defense theory" that Ms. Robinson was the shooter. Specifically, the Petitioner alleged that prejudice occurred because of her acknowledgement in front of the jury that she changed her shoes in preparation for a fight; her testimony that she assisted Ms. Robinson with sneaking her handgun into The Grand by distracting a person at the door, which the Petitioner had omitted from her police statement; and the State's rebuttal evidence, which would not have been admissible had she declined to testify.

At the March 28, 2019 post-conviction hearing, the Petitioner testified that trial counsel was assisted by counsel's father[3] and that the Petitioner and counsel met before the trial to discuss the defense strategy. Trial counsel and the Petitioner spoke about the Petitioner's police statement, the evidence at trial, and whether the Petitioner should testify. Upon questioning by the post-conviction court, the State and post-conviction counsel

---

[3] Counsel's father, an experienced criminal defense attorney, passed away in an October 14, 2014 car accident.

agreed that the trial court conducted a <u>Momon</u>[4] colloquy in the Petitioner's case. Post-conviction counsel noted that the Petitioner was not alleging that she failed to understand her right not to testify.

The Petitioner affirmed that she understood her rights regarding testifying at trial and that the decision was ultimately hers. The Petitioner claimed that trial counsel's advice was that "when people don't testify they look guilty and . . . people w[ould] automatically think that" the Petitioner was guilty if she chose not to testify. The Petitioner agreed that she conveyed to counsel her belief that Ms. Robinson was the shooter. The Petitioner stated that counsel warned her that she could be found guilty even if she testified. The Petitioner did not recall whether counsel discussed with her how she would be cross-examined. The Petitioner similarly did not remember whether they discussed the Petitioner's changing her shoes before the shooting. The Petitioner believed that she and counsel discussed that the Petitioner was aware that Ms. Robinson had a gun and that the Petitioner helped Ms. Robinson smuggle it into the nightclub. The Petitioner agreed that she told counsel about giving Ms. Robinson bullets and about her statement to the police that she had fired shots outside the nightclub.

The Petitioner stated that she initially did not wish to testify because she had already denied involvement in the shooting in her police statement. The Petitioner was also concerned about "tell[ing] on" Ms. Robinson; although the Petitioner believed that counsel told her something "to alleviate [her] concerns," she did not recall what was said. The Petitioner stated that she relied "all the way" on counsel's advice and chose to testify because she wanted the jury to hear her version of events.

The Petitioner testified that she went to trial expecting to testify and that after the State presented its evidence, counsel discussed the Petitioner's testifying with her, but she did not remember what was said. The Petitioner did not recall whether she understood that she could change her mind at any time. The Petitioner stated that after the State showed a recording of her police interview, she did not want to testify because "they already had [her] saying . . . what [she] did and didn't do." The Petitioner acknowledged that she told the trial court that she understood her rights and that she wished to testify. The Petitioner recalled the State's cross-examining her with statements she made "before" to the police and the State's calling Ms. Davis as a rebuttal witness. The Petitioner did not remember whether counsel told her about the State's ability to call rebuttal witnesses if she testified.

---

[4] Referring to <u>Momon v. State</u>, 18 S.W.3d 152 (Tenn. 1999), where our supreme court outlined a prophylactic procedure designed to insure that a defendant's waiver of his right to testify is voluntary, knowing, and intelligent. Although this procedure is not required when a criminal defendant elects to testify, some trial courts choose to conduct the same colloquy in order to ensure that the defendant understands his or her rights before testifying.

On cross-examination, the Petitioner testified that before the trial, counsel, counsel's father, and an investigator met with her in jail. The Petitioner agreed that she reviewed some of the police statements, although she could not recall whether she reviewed Ms. Williams's and Ms. Davis's statements or photographs of the crime scene. The Petitioner stated that she discussed testifying with both counsel and counsel's father, who had also advised her to testify, on separate occasions. The Petitioner acknowledged that she was familiar with counsel's father's professional reputation and that she was comfortable with him. The Petitioner recalled an incident during jury selection in which a prospective juror had expressed an opinion about defendants who chose not to testify. After the incident, counsel advised the Petitioner that the jurors might infer her guilt if she did not testify.

The Petitioner testified that although she did not recall the trial court's informing her of her rights, she affirmed that she understood that testifying was her choice and that she wanted the jury to hear what she had to say. She acknowledged that she was charged with first degree murder but convicted of second degree murder, as a result of which she received less than a life sentence; she opined that she "wouldn't say that's successful[.]" The Petitioner agreed that she "got [her] story out there" and that her trial testimony was truthful. The Petitioner noted that she had not spoken to the jurors and did not know the basis for the verdicts.

Trial counsel testified that she was appointed to represent the Petitioner, whom she had represented in a previous case, and that they met prior to trial to discuss the discovery materials, the evidence, and the defense strategy, which was to identify Ms. Robinson as the shooter and emphasize the Petitioner's lack of knowledge that Ms. Robinson "was going to be shooting." Counsel agreed that the Petitioner informed her that she shot her gun outside the nightclub and that she gave Ms. Robinson bullets before they entered the nightclub. The Petitioner also conveyed to counsel her inability to conceal a gun in her tight clothing, which counsel argued at trial. Counsel did not recall whether she and the Petitioner discussed the Petitioner's helping Ms. Robinson by distracting a security guard; however, counsel believed that this incident was included in the Petitioner's police statement. Counsel affirmed that the Petitioner informed her about having changed her shoes before returning to the nightclub.

Counsel testified that she advised the Petitioner to testify after conveying that it was ultimately the Petitioner's decision. Counsel stated that she based her advice upon Ms. Robinson's being "on the run" and the defense's desire to blame Ms. Robinson for the shooting. Counsel noted that one witness identified the Petitioner as the shooter and that Ms. Haynes had provided conflicting accounts; in counsel's opinion, it was unlikely that the jury would accept that the Petitioner was not the shooter "after hearing from somebody else who[ was] directly saying it." Counsel stated that an expert witness in memory and witness identification was not allowed to testify. Counsel noted her impression that the

Petitioner was truthful and "very consistent" and her belief that the Petitioner would "come across" to the jury in the same manner.

Trial counsel testified that although she discussed accomplice liability with the Petitioner, she did not focus on it "as much" because she was more concerned about defending against the assertion that the Petitioner was the shooter. Counsel said that she discussed with her father and the Petitioner that accomplice liability was a risk. Counsel acknowledged that her explanation of accomplice liability was perhaps not as lengthy as it "should have" been. Counsel agreed that she still advised the Petitioner to testify in spite of the risk of the Petitioner's being implicated as Ms. Robinson's accomplice.

Trial counsel testified that during the trial, the Petitioner was reluctant to testify; counsel noted that her father was "very persuasive in this matter." Counsel stated that before the trial, the Petitioner was nervous about testifying in general and that they went "back and forth" with her. Counsel stated the expert witness told her that he showed the Petitioner's recorded statement to a class he taught and that the class did not like the Petitioner. Counsel stated that this information concerned her, but that she ultimately "cast that concern aside." Counsel said that after the expert witness's testimony was excluded at trial, she felt more strongly that the Petitioner should testify. Counsel acknowledged that if the Petitioner had chosen not to testify, counsel's cross-examination of Ms. Williams would still have been the same. Counsel agreed that the Petitioner was very cooperative and tried to do what counsel thought was best.

On cross-examination, trial counsel testified that the Petitioner's case was the first murder trial she "was the lead on[.]" Counsel noted that she had assisted her father with "a ton of" cases, that she had been a "gofer" in "quite a few murder trials," and that she had been practicing law for six years at the time of the Petitioner's trial. Counsel had represented clients in preliminary hearings on various felony charges and conducted criminal trials. Counsel affirmed that her father was present for the entire trial. Counsel was experienced in evaluating prospective cases and stated that although the Petitioner's case was not "different" from others on which counsel worked with her father, "it was a weird case." Counsel explained that it was unusual for a trial to occur when a co-defendant was evading arrest and that this was the first case she had encountered in which the identity of the shooter was at issue.

Trial counsel testified that the Petitioner was aware of the discovery materials, the witness statements, and the testimony at trial when the Petitioner decided to testify. Counsel noted that the trial court reviewed the Petitioner's rights with her before she testified. Counsel agreed that her father was known for wanting his clients to testify and that he had both "spectacular success" and "spectacular failure" with this approach.

On June 3, 2019, the post-conviction court issued a written order denying the petition. The court noted that trial counsel had been assisted by counsel's late father, an attorney with "a vast and extensive range of experience" in criminal defense, including trying multiple first degree murder cases. The court found that direct and circumstantial evidence indicated that the Petitioner was the shooter, that counsel had advised the Petitioner to testify, and that the Petitioner participated in a Momon colloquy before testifying. The court further found that counsel's advice was a reasonable and tactical decision in light of a "Hobson's choice" between exposing the Petitioner to cross-examination and allowing the jury not to hear the Petitioner's "sworn denial" that she was the shooter. The court noted that counsel's advocacy helped persuade the jury to acquit the Petitioner of first degree murder. The Petitioner timely appealed.

ANALYSIS

The Petitioner contends that she received ineffective assistance of trial counsel as a result of counsel's advice that the Petitioner testify. The State responds that counsel's advice was tactical and that the Petitioner has not proven prejudice.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. However, we review the post-conviction court's application of the law to its factual findings de novo with no presumption of correctness. Id. at 457.

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In this case, the record supports the post-conviction court's finding that trial counsel's advice was a reasonable tactical decision. Counsel's defense team included her highly experienced father, and both attorneys advised the Petitioner to testify in the absence of her co-defendant. Counsel knew the Petitioner from a previous representation and found the Petitioner's version of events believable. The Petitioner noted that a prospective juror expressed an opinion at voir dire regarding a defendant's not testifying, after which counsel conveyed the possibility that the jury might infer guilt from the decision not to testify. Counsel reviewed all the evidence with the Petitioner and informed her of her rights. Counsel articulated that throughout the trial, she reassessed whether it was desirable for the Petitioner to testify; after the expert witness and Mr. North were not permitted to provide exculpatory evidence, counsel concluded that it was unlikely the jury would be persuaded to acquit the Petitioner without hearing testimony to rebut Ms. William's positive identification of the Petitioner as the shooter. As the post-conviction court noted, "significant direct and circumstantial evidence pointed to the [Petitioner] as the shooter[.]" The Petitioner was the only person who could present an alternative narrative to the State's theory.

Trial counsel was not deficient in making a judgment call based upon adequate preparation and, from all accounts, a conscientious and flexible approach to difficult circumstances at trial. We note that the Petitioner was questioned by the trial court and affirmed that she was making a voluntary and knowing decision to testify. We further note that counsel's strategy was not wholly unsuccessful and that the Petitioner was convicted of lesser-included offenses, resulting in a significantly reduced sentence. The Petitioner is not entitled to relief on this basis.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE